UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO: 3:14-CV-00844-GNS-CHL

LEVEL 3 COMMUNICATIONS, LLC &                     PLAINTIFFS
WILTEL COMMUNICATIONS, LLC

v.

TNT CONSTRUCTION, INC.                                    DEFENDANT

**MEMORANDUM OPINION & ORDER**

This matter is before the Court on Defendant's Motion for Partial Summary Judgment (DN 70). This motion is ripe for adjudication. For the reasons stated below, the motion is **GRANTED IN PART AND DENIED IN PART**.

**I.     STATEMENT OF FACTS**

Level 3 Communications, LLC ("Level 3") is a telecommunications company that relies on a nationwide network of underground fiber-optic cable to provide its services. (Compl. ¶ 6, DN 1).[1] These cables are essentially pipelines that carry telecommunications traffic from terminal-to-terminal across Level 3's network. Part of that network includes a fiber-optic cable (the "Cable") in the right-of-way along the east side of the intersection of Reedyville Road and Hunt Church Road in Roundhill, Kentucky, which connects Level 3's terminals in Louisville, Kentucky, and Portland, Tennessee. (Compl. ¶ 7; Pls.' Answer to Def.'s Interrog. No. 7, DN 70-3). On October 3, 2012, TNT Construction, Inc. ("TNT") was doing excavation work at or near

---

[1] For sake of convenience, Plaintiff WilTel Communications, LLC is not referenced in this memorandum. It is a wholly-owned subsidiary of Level 3, and its claims are identical to Level 3's. (Compl. ¶ 7).

1

the southeast corner of the intersection of Reedyville Road and Hunt Church Road. (Compl. ¶ 10). During the job, TNT severed the Cable and damaged a conduit bank. (Compl. ¶ 10).

According to Level 3, the systems that were active, and thus interrupted, when TNT severed the Cable had a capacity of 18,816 DS-3s.[2] (Pls.' Answer to Def.'s Interrog. No. 7). Level 3 describes a DS-3 as "the common denominator used throughout the telecommunications industry as a measure of capacity." (Pls.' Answer to Def.'s Interrog. No. 7). Technically, a DS-3 is an electrical circuit that transmits data at around 44.7 megabits per second. (Pls.' Mem. Opp'n Def.'s Mot. Summ. J. 5 n.2, DN 76 [hereinafter Pls.' Opp'n]). In turn, the total capacity affected by the Cable's severance was roughly 841,075.2 megabits per second, or 841.075 gigabits per second.

Level 3's system has redundant capacity. (Pls.' Resp. to Def.'s Req. for Admis. No. 2, DN 70-2). If a cable goes down, Level 3 can reroute the data traffic to spare capacity on other fiber-optic cables in the network so that the data still reaches its final destination. (Pls.' Resp. to Def.'s Req. for Admis. No. 1). Level 3 maintains that it uses this redundant capacity solely for "emergencies." (Fox Decl. 5, DN 76-1). Level 3 claims that, in this case, it was unable to reroute 18,816 DS-3s worth of capacity interrupted by the Cable's severance. (Fox Decl. 8). As a result, according to Level 3, some of its users had their service completely interrupted until it could repair the Cable to working order. (Fox Decl. 8). TNT, however, avers that Level 3 was able to automatically reroute all active traffic affected by the severance so that no service was

---

[2] DS-3 circuits are carried by optical carrier or transport systems denominated as OC-48, OC-192, etc. (Pls.' Opp'n 5 n.3). These transport systems essentially act as hubs—they bundle electrical signals from DS-3s, convert them, and send them down fiber-optic cable. (Pls.' Opp'n 5 n.3). The number following "OC" indicates the capacity of the transport system. (Pls.' Opp'n 5 n.3). An OC-48, for example, has the capacity of 48 DS-3s, or 2.5 gigabits. (Pls.' Opp'n 5 n.3). At the time of severance, the Cable could transport OC-192s, which have the capacity of 192 DS-3s, or 10 gigabits. (Graham Dep. 52:3-13, May 3, 2016, DN 77-6; Pls.' Opp'n 5 n.3).

interrupted. (Def.'s Mem. Supp. Summ. J. 3, DN 70-1 [hereinafter Def.'s Mem. Supp.]). In any event, Level 3 restored service 6.3 hours after the Cable was cut. (Fox Decl. 8).

Level 3 now seeks $3,369,894.42 in damages from TNT. (Pls.' Answer to Def.'s Interrog. No. 7). This sum includes: (1) $61,288.98 for repair costs; and (2) $3,308,605.44 for loss of use of the Cable. (Pls.' Answer to Def.'s Interrog. No. 7). TNT's summary judgment motion does not challenge Level 3's repair costs, but only the claimed loss-of-use damages.

Level 3 bases its loss-of-use damages on what it claims would have been the cost of renting additional capacity from another carrier for the 6.3-hour period during which the Cable was inactive. (Pls.' Answer to Def.'s Interrog. No. 7). Level 3 says it needed 18,816 DS-3s worth of capacity to cover the systems interrupted by the cut cable, so it looked to other carriers' rates for DS-3 lines between Louisville, Kentucky, and Portland, Tennessee. (Pls.' Answer to Def.'s Interrog. No. 7). Apparently, the terminals in Louisville and Portland are in separate Local Access and Transport Areas. (Pls.' Answer to Def.'s Interrog. No. 7). Therefore, according to Level 3, the cost of replacing impacted capacity includes: (1) the cost from the local exchange carrier in Louisville (BellSouth) to transport the traffic from Level 3's terminal to the alternate long distance carrier's (MCI) terminal in Louisville; (2) the cost to transport traffic from MCI's terminal in Louisville to Portland; and (3) the cost from the local exchange carrier in Portland (Bellsouth) to transport traffic from MCI's terminal to Level 3's terminal in Portland. (Pls.' Answer to Def.'s Interrog. No. 7).

The BellSouth rate in Louisville consists of: (1) a monthly recurring charge of $4,112.00 per DS-3; and (2) a one-time installation charge of $1,430.00 per DS-3. (Pls.' Answer to Def.'s Interrog. No. 7). The MCI rate between Louisville and Portland consists of: (1) a monthly recurring charge of $2,700 per DS-3; (2) a monthly recurring charge of $7.00 per mile per DS-3;

and (3) a one-time installation charge of $600 per DS-3. (Pls.' Answer to Def.'s Interrog. No. 7). The BellSouth rate in Portland consists of: (1) a monthly recurring charge of $9,982.00 per DS-3; and (2) a one-time installation charge of $1,265.00. (Pls.' Answer to Def.'s Interrog. No. 7). Level 3 states that it prorated these charges to represent only the 6.3 hours it took to repair the Cable to the point traffic was no longer impacted. (Pls.' Answer to Def.'s Interrog. No. 7). Using this methodology, the cost of 18,816 DS-3s in Louisville would be $912,434.88, the cost between Louisville and Portland would be $544,464.48, and the cost in Portland would be $1,851,706.08—for a total of $3,308,605.44 for the period of service interruption. (Pls.' Answer to Def.'s Interrog. No. 7).

Level 3 never actually rented substitute capacity. (Pls.' Resp. to Def.'s Req. for Admis. No 16). Indeed, the Level 3 representative who calculated loss-of-use damages testified that she did not determine whether it was even possible to rent replacement capacity for 6.3 hours. (Fox Dep. 30:2-4, May 04, 2016, DN 77-2). She noted, "[a]s a general course of business, we don't rent . . . replacement to get our fiber cuts back up. We repair the fiber cut and get the customers restored." (Fox Dep. 30:2-9). Moreover, she never verified whether the Cable carried DS-3s or investigated the rates for any OC transport systems; rather, she used DS-3s because they supposedly provide "a middle of the road" price. (Fox Dep. 31:11-35:13, 51:3-21). In fact, when pressed on the issue, she stated "[w]e use the DS-3. That's our common denominator. That's just how we do our loss of use calculation." (Fox Dep. 51:3-21). Level 3 has provided no evidence showing that it has ever rented substitute capacity for a period of time less than 30 days and admits it would have taken longer than 6.3 hours to rent substitute capacity or a replacement cable from another carrier. (Pls.' Resp. to Def.'s Req. for Admis. Nos. 15, 17). Importantly, Level 3 has admitted that it is not aware of any profits lost, refunds paid to any customers,

4

customers lost, or any monetary loss whatsoever as a direct result of the interruption in service caused by TNT's severance of the Cable. (Pls.' Resp. to Def.'s Req. for Admis. Nos. 20, 21, 22, 24, 25).

## II.     JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 1332(a)(1) because there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

## III.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A genuine dispute of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Generally, "the moving party bears the initial burden of identifying those parts of the record that demonstrate the absence of any genuine [dispute] of material fact." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)). If, however, the moving party does not bear the burden of proof on the issue for which it seeks summary judgment, it may meet its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Id.* (citing *Celotex Corp.*, 477 U.S. at 325). Once the moving party shows that there is an absence of evidence to support the nonmoving party's case, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In ruling on a motion for summary judgment, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Moldowan*, 578 F.3d at 374 (quoting *Anderson*, 477 U.S. at 249). The Court must view the evidence in the light most favorable to the non-moving party and determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251. "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Moldowan*, 578 F.3d at 374 (quoting *Anderson*, 477 U.S. at 252).

## IV. DISCUSSION

TNT's motion raises two questions for the Court: (1) whether Level 3 is entitled to damages under Kentucky law for the loss of use of a fiber-optic cable for 6.3 hours; and (2) if so, whether the theoretical cost of renting 18,816 DS-3s is an appropriate measure of those damages. For the reasons set forth below, the Court answers the first question in the affirmative and the second in the negative.

### A. Loss of Use Damages for Injured Property

TNT is correct in noting that no Kentucky court has specifically addressed whether loss-of-use damages are appropriate in this context.[3] There is, however, some Kentucky case law that provides guidance.

---

[3] Kentucky law governs Level 3's claims. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 71 (1938). In diversity actions, federal courts must apply state law in accordance with the decisions of the state's highest court. *Ziegler v. IBP Hog Market, Inc.*, 249 F.3d 509, 517 (6th Cir. 2003) (internal citations omitted). When evaluating an undecided question of Kentucky law, a federal court sitting in diversity must make "the best prediction, even in the absence of direct state

6

Kentucky courts have long recognized the availability of reasonable loss-of-use damages for injury to property. *Schulte v. Louisville & N.R. Co.*, 108 S.W. 941, 944 (Ky. 1908) ("There are cases in which it would be proper to allow the plaintiff to recover the value of the use of the property of which he was deprived by negligence or wrongful act . . . ."); *Louisville & I.R. Co. v. Schuester*, 209 S.W. 542, 545 (1919); *see also Louisville & N.R. Co. v. Gillespie*, 177 S.W. 451, 454 (1915) (indicating that in addition to damages for repair costs, loss-of-use damages are appropriate where telephone lines damaged); *Wheeler v. Tackett*, 339 S.W.2d 646, 649 (Ky. 1969) (loss-of-use damages appropriate where easement obstructed). Moreover, in *Southern Railway in Kentucky v. Kentucky Grocery Co.*, 178 S.W. 1162 (Ky. 1915), Kentucky's highest court recognized that "[t]he rule is that, where an injury to personal property necessarily results in the loss of the use of the property while it is being repaired, the owner may . . . recover the reasonable value of its use during a period reasonably necessary to effect such repairs . . . ." *Id.* at 1163.

Level 3 has provided evidence showing that it was unable to use the Cable for 6.3 hours because TNT severed it. Thus, at first glance, it appears that Level 3 could be entitled to loss-of-use damages. The question, however, is whether the particulars of Level 3's fiber-optic cable system change this conclusion for purposes of summary judgment.

---

precedent, of what the Kentucky Supreme Court would do if it were confronted with [the] question." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004) (internal quotation marks omitted) (quoting *Managed Healthcare Assocs., Inc. v. Kethan*, 209 F.3d 923, 927 (6th Cir. 2000)). In doing so, the Court looks to "the decisions (or dicta) of the Kentucky Supreme Court in analogous cases, pronouncements from other Kentucky courts, restatements of law, commentaries, and decisions from other jurisdictions." *State Auto Prop. & Cas. Ins. Co. v. Hargis*, 785 F.3d 189, 195 (6th Cir. 2015) (internal citations omitted). Of course, federal courts "must proceed with caution" when making such predictions. *Combs*, 354 F.3d at 577 (internal citations omitted).

Numerous courts from other jurisdictions have addressed whether a telecommunications company can recover loss-of-use damages under circumstances similar to those here. Some courts have allowed damages for loss of use, and others have not. *MCI, LLC v. Patriot Eng'g & Envtl., Inc.*, 487 F. Supp. 2d 1029, 1035 nn.3-4 (S.D. Ind. 2007) (collecting cases). In spite of the split, however, there are common threads running through the cases. A majority of decisions hold that a telecommunications company is not entitled to loss-of-use damages for a damaged fiber-optic cable when there is no resultant interruption of service because all traffic on the cable is quickly rerouted to redundant capacity in the company's network. *See MCI WorldCom Network Servs. v. Mastec, Inc.*, 995 So. 2d 221, 224 (Fla. 2008). For example, in *MCI Worldcom Network Services v. Lind*, No. 00-4407-CIV-JORDAN, 2002 U.S. Dist. LEXIS 26467 (S.D. Fla. Dec. 17, 2002), the court held that MCI was not entitled to loss-of-use damages where there was "no evidence that MCI was unable to provide uninterrupted service to its customers as a result of the damage to the cable by [the defendant]." *Id.* at *4; *accord MCI WorldCom Network Servs. v. W.M. Brode Co.*, 413 F. Supp. 2d 868, 872-73 (N.D. Ohio 2005); *Mastec*, 995 So. 2d at 229; *AT&T Corp. v. Columbia Gulf Transmission Co.*, No. 07-1544, 2008 U.S. Dist. LEXIS 109199, at *13 (W.D. La. Sept. 15, 2008). Other courts, however, have held that a telecommunications company is entitled to loss-of-use damages in cases where service is lost. *See, e.g.*, *MCI WorldCom Network Servs., Inc. v. Kramer Tree Specialists Inc.*, No. 02 C 7150, 2003 U.S. Dist. LEXIS 10542, at *8 (N.D. Ill. June 19, 2003).

Application of the "spare boat" doctrine may shed light on whether using redundant capacity instead of renting a replacement prohibits recovery for loss-of-use damages. Two leading cases considering this doctrine are *The Cayuga*, 5 F. Cas. 329 (C.C.E.D.N.Y. 1880), *aff'd*, 81 U.S. 270 (1871), and *Brooklyn Eastern District Terminal v. United States*, 287 U.S. 170

(1932). In *The Cayuga*, a ferry and another boat collided. *The Cayuga,* 5 F. Cas. at 329. The owners of the ferry had a spare boat that they used while the ferry was being repaired. *Id.* at 331. As a result, the ferry owners did not suffer a pecuniary loss while the ferry was inoperable. *Id.* Nonetheless, the circuit court concluded and the Supreme Court affirmed that the ferry owners were entitled to loss-of-use damages, even though the owner did not actually have to rent a replacement boat. *Id.*

In *Brooklyn Terminal*, a tugboat was damaged in a collision. *Brooklyn E. Dist. Terminal*, 287 U.S. at 172. The tugboat's owner did not obtain a substitute boat while the tug was being repaired, but instead worked its other boats overtime. *Id.* at 177. Under those circumstances, the Supreme Court refused recovery of loss-of-use damages, distinguishing *The Cayuga* as follows:

> The doctrine of the "spare boat" cases is invoked by the petitioner as decisive in its favor, but we think without avail. Shipowners at times maintain an extra or spare boat which is kept in reserve for the purpose of being utilized as a substitute in the contingency of damage to other vessels of the fleet. There are decisions to the effect that in such conditions the value of the use of a boat thus specially reserved may be part of the demurrage. If no such boat had been maintained, another might have been hired, and the hire charged as an expense. The result is all one whether the substitute is acquired before the event or after . . . . [H]owever, . . . there has been a refusal to extend the doctrine to boats acquired and maintained for the general uses of the business . . . .
>
> So here. The petitioner was engaged in an established business using tugs for a single purpose. It had no thought to turn that business into one of a different kind while this tug was out of service. Mindful of the need to minimize the damages, it used to the full its available resources, and was able by special effort to make them do the work. We are unable to accept the argument that the expenses which it saved are to be charged to the respondent as if they had not been saved at all.

*Id.* at 176-77 (internal citations omitted).

Many recent cases involving damaged fiber-optic cables rely on the distinction articulated in *Brooklyn Terminal* in determining whether a telecommunications company's redundant capacity prevents recovery of loss-of-use damages. For example, in *MCI WorldCom*

9

*Network Services v. Atlas Excavating, Inc.*, No 02 C 4394, 2006 U.S. Dist. LEXIS 88956 (N.D. Ill. Dec. 6, 2006), the court allowed loss-of-use damages because the plaintiff used its redundant capacity for emergencies only, and not in its general business. *Id.* at *22. *Accord Patriot*, 487 F. Supp. 2d at 1034 n.2 (noting that defendant's concession that the plaintiff would be entitled to loss-of-use damages was consistent with the spare boat doctrine because the plaintiff only used its redundant capacity in emergencies); *MCI WorldCom Network Servs., Inc. v. Kramer Tree Specialists*, No. 02 C 7150, 2003 U.S. Dist. LEXIS 16925, at *4 (N.D. Ill. Aug. 15, 2003). On the other hand, in cases such as *MCI WorldCom Network Services, Inc., v. OSP Consultants, Inc.*, 585 S.E.2d 540 (Va. 2003), courts have refused to allow recovery for loss-of-use damages where the plaintiff used its redundant capacity in the ordinary course of business and did not reserve it expressly for emergencies. *Id.* at 396. *Accord Lind*, 2002 U.S. Dist. LEXIS 26467, at *12-13; *W.M. Brode Co.*, 413 F. Supp. 2d at 872-73.

TNT argues that Level 3 cannot recover loss-of-use damages because Level 3 has redundant capacity in its network. TNT claims that Level 3 was able to instantly reroute all of the traffic on the Cable so that no service was interrupted. Level 3, however, has produced evidence showing that service was interrupted, which distinguishes the present case from cases like *Lind*. (Fox Decl. 6-8). Moreover, Level 3 has produced evidence that shows it uses its redundant system solely for emergencies. (Fox Decl. 5). As a result, for purposes of summary judgment, this case is more like *The Cayuga* than *Brooklyn Terminal*, which indicates loss-of-use damages are available as a general matter.

Likewise, the fact that Level 3 failed to rent replacement capacity and suffered no pecuniary loss as result of the Cable's severance is not dispositive.[4] Kentucky's highest court has not clearly held that loss-of-use damages are unavailable when the aggrieved party fails to rent a replacement. *Pope's Adm'r v. Terrill*, 214 S.W.2d 276, 278 (Ky. 1948) ("It does not appear that this court has made a definite declaration on the precise abstract point one way or the other . . . . And it is not necessary to explicitly do so here."). In *Pope*, the court stated that "[i]t is generally held that such failure does not preclude recovery, although the good faith intention of actually using, or the character of such intended use, may affect the amount of recovery." *Id.* (internal citations omitted).

---

[4] TNT relies on KRS 304.39-115 and a decision from a sister court as support for the proposition that loss-of-use damages are not allowed when no replacement property is rented. That statute provides:

> Loss of use of a motor vehicle, regardless of the type of use, shall be recognized as an element of damage in any property damage liability claim. Such a claim for loss of use of a motor vehicle shall be limited to reasonable and necessary expenses for the time necessary to repair or replace the motor vehicle.

KRS 304.39-115. In *State Farm Mutual Automobile Insurance Co. v. Norcold,* Inc., 143 F. Supp. 3d 586 (E.D. Ky. 2015), Judge Bertelsman applied Kentucky law and addressed how the use of "necessary" in the statute affects recovery for loss-of-use damages. The plaintiff there asserted he was entitled to loss-of-use damages for a damaged RV, but he did not actually rent another RV. *Id.* at 591. Despite noting that there was no Kentucky case law on point and that pre-enactment authority supported the plaintiff's position, the court denied recovery for loss of use because "the plain language [of the statute] requires that any loss of use expense be 'necessary,' and by definition [plaintiff] had no 'necessary' expense . . . ." *Id.* The RV was not the plaintiff's only residence or vehicle, so it was not necessary for him to rent a replacement to use until he could buy a new one. *Id.* While KRS 304.39-115 relates to the issue at hand in a general sense, it is expressly limited to motor vehicles. The Kentucky Court of Appeals has stated that "in order to abrogate the common law and create an exclusive statutory remedy, the legislature must specifically and explicitly state that it intends to do so." *Brown Sprinkler Corp. v. Somerset-Pulaski Cty. Dev. Found., Inc.*, 335 S.W.3d 455, 458 (Ky. App. 2010) (citing *Stovall v. A.O. Smith Corp.*, 676 S.W.2d 475, 476 (Ky. App. 1984)). Courts "[c]annot assume, presume, or infer such legislative intent." *Id.* (citing *Day v. Day*, 937 S.W.2d 717, 719 (Ky. 1997)). As a result, KRS 304.39-115 does not limit the types of damages Level 3 can potentially recover in this case.

While no Kentucky court has held that proof of actual pecuniary loss is a prerequisite to recovery of loss-of-use damages, the Restatement (Second) of Torts recognizes that loss-of-use damages are available to compensate for injury to land or chattels regardless of whether the injured party suffers pecuniary loss. Restatement (Second) of Torts § 931 cmt. b (stating that recovery is permitted "even though the owner in fact has suffered no harm through the deprivation, as when he was not using the subject matter at the time or had a substitute that he used without additional expense to him."). Moreover, commentators have noted that adherence to the rule that the party requesting loss-of-use damages be required to prove actual pecuniary loss to recover is misplaced because it "[f]ails to recognize that ownership of a chattel carries with it the right to use or control the use of that chattel." James M. Lee, *Loss of Use Damage for Injuries to Interests in Commercial Chattels*, 15 Fordham Urb. L.J. 235, 244 (1983); *see also* 22 Am. Jur. 2d. *Damages* § 152 (1988).

For purpose of summary judgment and based on general Kentucky common law principles and various opinions from sister courts throughout the country addressing the specific issue at hand, the Court concludes Level 3 is entitled to seek loss-of-use damages for the 6.3 hours it was deprived of using the Cable.

    B.    **<u>Measuring Loss of Use</u>**

But how to measure Level 3's loss of use? Ah, there's the rub. Indeed, while not delineated as such, many—if not all—of TNT's arguments go to Level 3's use of rental value to calculate its damages, which it contends is inappropriate under Kentucky law.

Kentucky courts have recognized that the value of the use of property is not susceptible of precise measurement, but that rental value is a relevant factor. *Wheeler*, 339 S.W.2d at 649 (citing *Adams Const. Co. v. Bentley*, 335 S.W.2d 912, 914 (Ky. 1960)). In some cases, the

market rental value is the most accurate measure of loss-of-use damages possible. *Pope*, 214 S.W.2d 276, 278 ("[W]here a commercial automobile is involved, the market rental value of such a machine is probably as accurate a measurement as may be produced."). That market rental value, however, must be reasonable and capable of accurate estimation. *See S. Ry. in Ky.*, 178 S.W. at 1163; *Schuester*, 209 S.W. at 545. Indeed, "[t]he only sound reason for ever denying [a party] any part of the loss he may suffer as the result of the wrongful act of another is that it is incapable of accurate estimation and therefore as a necessary rule of practice is too remote or too speculative for judicial cognizance." *Schuester*, 209 S.W. at 545.

In determining whether market rental value is a reasonable, accurate measure of Level 3's loss-of-use damages, the first question is whether a rental market exists. In *Kentucky Utilities Co. v. Consolidated Telephone Co.*, 252 S.W.2d 437 (Ky. 1952), Kentucky's highest court refused to use market value to measure damages to a telephone line because "[i]n ordinary circumstances a portion of a telephone system would not be marketable as such" and thus "[a]ny estimate of the market value of a portion of a telephone system would be conjectural." *Id.* at 441. Likewise, in *The Cayuga*, the court explained that the general rule of measuring the value of loss of use by rental value "can only be intended to be applied in cases where there is such a market to refer to . . . ." *The Cayuga*, 5 F. Cas. 326, 327 (E.D.N.Y. 1868). Moreover, in *Brooklyn Terminal*, the U.S. Supreme Court noted that "the disability of a vessel will not sustain demurrage at the rate of the value of her hire unless an award at such a rate can be seen as reasonable when the disability is viewed in the setting of the circumstances." *Brooklyn E. Dist. Terminal*, 287 U.S. at 174.

Turning to the circumstances at hand, Level 3 proposes its loss-of-use damages be measured by the cost of renting 18,816 DS-3s for 6.3 hours. As other courts have recognized,

13

there is no market for renting DS-3 cables on an hourly or even weekly basis. *Patriot*, 487 F. Supp. 2d at 1038-39; *MCI Commc'n Servs. v. CMES, Inc.*, 728 S.E.2d 649, 655 (Ga. 2012). This same circumstance is supported by the record in this case. According to Level 3's calculations, each DS-3 carries with it a monthly recurring charge and one-time installation fee, which indicates that hourly, or even weekly rentals, do not exist. Moreover, Level 3 has provided no evidence showing that it has ever rented substitute capacity for a period of time less than 30 days. Its own tariff sheet for switched access services shows that Level 3 would not rent its telecommunications lines to another company for less than one month. (Tariff Schedule Applicable to Switched Access Services Within the State of Kentucky by Level 3 Communications, LLC, at 54, DN 77-5). The Level 3 employee who calculated its loss-of-use damages in this case did not even determine whether it was possible to rent replacement capacity for 6.3 hours. Indeed, prorating the monthly fee seems to be an implicit recognition that no hourly market exists.

It appears that no telecommunications company would ever actually rent replacement capacity for such a short term. First, Level 3's representative testified that Level 3 does not replace capacity; it merely repairs damaged cables. Second, the time required to secure replacement capacity would be longer than the time required to repair a damaged cable. Level 3 has admitted that it would have taken longer to rent substitute capacity or a replacement cable from another carrier than it took to repair the damaged cable. (Pls.' Resp. to Def.'s Req. for Admis. No. 17, DN 70-2).

This case is not comparable to other Kentucky cases that measure the loss of use by rental value. The lion's share of those decisions dealing with rental value in the context of damaged

automobiles.[5] In such cases, accurately measuring the rental value of the damaged property is not an issue because there is a well-defined market for renting vehicles. Moreover, it is apparent that the courts in those cases assumed that the injured party could have actually rented a reasonable substitute. Here, however, there is no market and thus no like assumption can be made—as the court in *Lind* observed under similar circumstances, "[n]o party in [the company's] position . . . would have reasonably considered renting a replacement transmission system . . . ." *Lind*, 2002 U.S. Dist. LEXIS 26467, at *12.

The Court is not obligated to allow Level 3 to use rental value as a measure of its loss-of-use damages. As Kentucky has recognized, "[a]s to such property as is owned and held for use the criterion of damages for the loss of use is the value of such use." *Bozeman Mortuary Ass'n v. Fairchild*, 86 S.W.2d 979, 981 (Ky. 1935) (citation omitted). Furthermore, Kentucky's highest court acknowledged over a century ago that when determining loss-of-use damages "[d]ifferent criteria will be applied . . . to different cases." *Manning v. Grinstead*, 90 S.W. 553, 555 (Ky. 1906). It follows that rental value is simply one way to measure the value of the loss. *See Wheeler*, 339 S.W.2d at 649 (describing rental value as a factor); *see also Lind*, 2002 U.S. Dist. LEXIS 26467, at *10-11 ("Rental value does not define loss of use, but is only one method by which to determine what loss of use damages might be."). Rental value may be appropriate in cases involving automobiles and other property where such value is capable of easy and accurate estimation, but it is not appropriate here. *See Schuester*, 209 S.W. at 545. In fact, the majority of courts from other jurisdictions addressing this issue in nearly identical lawsuits brought by telecommunications companies against contractors have held that measuring loss-of-use

---

[5] *See, e.g.*, *S. Ry. in Ky.*, 178 S.W. 1162; *Schuester*, 209 S.W. 542; *Towles v. Perkins*, 98 S.W.2d 27 (Ky. 1936); *Ky. Transp. Co. v. Campbell*, 186 S.W.2d 409 (Ky. 1945); *Pope*, 214 S.W.2d 276.

damages by a theoretical rental value is inappropriate.[6]  *CMES*, 728 S.E.2d at 655 (collecting cases).

In light of these circumstances, Level 3's proposed measure of damages offends general principles of damages law.  Under Kentucky law, "[t]he object of compensatory damages is to make the injured party whole to the extent that is possible to measure his injury in terms of money.  The object is not to place the plaintiff in a better position than he would have been had

---

[6] Furthermore, Level 3's use of the rental cost of 18,816 separate DS-3 lines in calculating its damages is unreasonable.  It maintains that the DS-3 is the common denominator used throughout the telecommunications industry as a measure of capacity.  Nowhere, however, does it allege that the individual DS-3 is the appropriate *unit* by which to rent.  As Level 3 admits, DS-3s can be bundled into higher capacity optical carriers, such as OC-192s.  Briefly, instead of calculating the rental cost based on renting 18,816 DS-3 lines, paying monthly charges for each line, and paying an installation fee for each line, then prorating those charges to reflect the 6.3 hours the Cable was down, why not rent 98 OC-192s, which have the same capacity as 18,816 DS-3s?  One senior member of Level 3's engineering staff stated that it was more cost-efficient to use the highest bandwidth signals possible on stretches between cities; in fact, that is how the Cable operated when severed. (Graham Dep. 56:9-57:14).  A review of Graham's deposition testimony is instructive as to why renting 18,816 DS-3s ignores actual practice:

> Q.   Okay.  You mentioned something about traversing at the highest bandwidth possible.
> Why is that done?
> A.   Scale efficiency and cost.
> Q.   Okay.  So it's cheaper if you can traverse at the highest bandwidth possible?
> A.   Yes, sir.  It would be—if you had 18,000 electrical DS3s, you would have to have 18,000 electrical connections, or you can multiplex them into a higher bandwidth and send it across a single cable.
> Q.   Is that what Level 3 did as of October 3rd, 2012, between Louisville and Nashville?
> A.   Yes, sir.
> Q.   Why?  Because you just said you would need 18,000 what, otherwise?
> A.   Electrical connections.  Scale efficiency and cost is why.

(Graham Dep. 56:9-57:2).  Besides repeatedly stating that the DS-3 is the common denominator of capacity, Level 3 offers almost no explanation for why it was used.  The Level 3 representative who calculated loss-of-use damages neither verified whether the Cable carried DS-3s nor investigated the rates for the OC transport system.  She simply stated, "[w]e use the DS-3.  That's our common denominator.  That's just how we do our loss of use calculation." (Fox Dep. 51:14-16).

the wrong not been done." *Ky. Cent. Ins. Co. v. Schneider*, 15 S.W.3d 373, 374-75 (Ky. 2000) (internal citation omitted) (citation omitted). Moreover, an "injured party may not make a profit" out of an injury to his property. *Reed v. Mercer Cty. Fiscal Court*, 295 S.W. 995, 996 (Ky. 1927). Overall, "[t]he complete idea at the bottom of the matter of allowing damages is to compensate the owner in money that of which he was wrongfully deprived." *Manning*, 90 S.W. at 555.

Allowing Level 3 to measure its damages by the costs associated with an imaginary rental of 18,816 DS-3s for 6.3 hours would result in a windfall for Level 3 and put it in a position better than before the Cable was cut. Level 3 seeks over $3.3 million—more than 50 times repair costs—even though it is not aware of any profits lost, refunds paid to customers, or even one lost customer related to the cut cable. (Pls.' Supp. Answer to Def.'s Interrog. No. 20, DN 70-5). Any such measure of damages would go far beyond compensating Level 3 for that of which it was wrongfully deprived and would clearly operate as a windfall profit.[7]

Level 3 argues that the determination of its damages is up to a jury. That may be true, as far as it goes. The measure of damages, however, is a legal matter. 2 John S. Palmore & Donald P. Cetrulo, *Ky. Instructions to Juries* § 13.11 (2015). It is improper to authorize the jury to fix damages without confining it to the applicable measure of damages. *Id.* (internal citations

---

[7] The Court finds instructive a portion of Justice Cardozo's majority opinion in *Brooklyn Terminal* in which he explained the holding of *The Conqueror*, 166 U.S. 110 (1897):

> It held that recovery was excessive when based on the returns of an imaginary letting. We are to have regard in every case to the reasonable probabilities of time and place and circumstance. Demurrage on the basis of the cost of a substitute, actual or superstitious, may be no more than fair indemnity when gains have been lost or enjoyment seriously disturbed. Demurrage on a like basis may be so extravagant as to outrun the bounds of reason when loss of profit has been avoided without the hire of a substitute and the disturbance of enjoyment has been slight or perhaps fanciful.

*Brooklyn E. Dist. Terminal*, 287 U.S. at 175.

omitted). That being said, within reasonable bounds, the ultimate determination of Level 3's loss-of-use damages will be left to the jury. What Level 3 seeks at this point is far from reasonable.

## V. CONCLUSION

The Court finds that while Kentucky law allows loss-of-use damages generally, the Kentucky Supreme Court would not allow Level 3 to use the theoretical rental value it proposes as a measure of its loss-of-use damages in this case. Rental value is not capable of accurate estimation here because there is no functioning rental market for DS-3s for such a short term. Basing the value of Level 3's loss of use on a nonexistent market would be purely speculative. Ultimately, Level 3's proposed measure is unreasonable; it goes far beyond compensating Level 3 for its loss of use of the Cable and runs contrary to general principles of damages law.

For these reasons, Defendant's Motion for Partial Summary Judgment (DN 70) is **GRANTED IN PART AND DENIED IN PART**.

**Greg N. Stivers, Judge**
**United States District Court**
November 14, 2016

cc: counsel of record